UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARACRUZ TRADING, LTD., | ) |
| Plaintiff, | ) Civil Action No.<br>) 3:13-cv-1651 (JBA) |
| v. | ) |
| KOLMAR GROUP AG, | ) |
| Defendant. | ) |

| | |
|---|---|
| EMPRESS ENTERPRISES, LTD., | ) |
| Plaintiff, | ) Civil Action No.<br>) 3:13-cv-1652 (CSH) |
| v. | ) |
| KOLMAR GROUP AG, | ) |
| Defendant. | ) **JANUARY 21, 2015** |

**RULINGS ON PLAINTIFFS' MOTIONS TO DISMISS COUNTERCLAIMS
AND DEFENDANT'S MOTIONS FOR COUNTERSECURITY**

**HAIGHT, Senior District Judge:**

These two admiralty cases were consolidated for the purpose of deciding the captioned motions. Each Plaintiff moves to dismiss the Defendant's counterclaim. The Defendant moves to require each Plaintiff to furnish countersecurity. This Ruling decides those motions.

1

## I. FACTUAL BACKGROUND

Each of the two cases involves the ocean carriage of a cargo of 1.3 butadiene from the port of Haldia, India, to discharge ports in China (the first-captioned case) or South Korea (the second case). Butadiene's natural state is as a flammable gas. It can be compressed and liquefied. The principal use of the substance is in the manufacture of synthetic rubber.[1] In each of these cases, the carrying vessel was designated as an "LPG/C," or "Liquid Petroleum Gas Carrier."[2]

In the case bearing Docket Number 1651, Plaintiff Aracruz Trading, Ltd. ("Aracruz") was the owner of the LPG/C GAS MOXIE. In August 2012, Aracruz entered into a voyage charter party with Defendant Kolmar Group AG. ("Kolmar"). The charter party called for the GAS MOXIE to load a cargo of butadiene at the port of Haldia, India, transport the cargo to ports in the Republic of China, and there deliver the butadiene to receivers identified in an ocean bill of lading.

In the case bearing Docket Number 1652, Plaintiff Empress Enterprises, Ltd. ("Empress") was the owner of the LPG/C GAS EMPEROR. In July 2012, Empress entered into a voyage charter party with Kolmar. The charter party called for the GAS EMPEROR to load a cargo of butadiene at the port of Haldia, India, transport the cargo to ports in South Korea, and there deliver the cargo to receivers identified in an ocean bill of lading.

For the sake of convenience, I will on occasion refer to the individual actions as "No. 1651" and "No. 1652."

The vessels undertook to perform these voyage charter parties. For each of them, difficulties

---

[1] This description of 1.3 butadiene is taken from *Wikipedia* (visited January 16, 2015).

[2] In an earlier and less complicated world, ocean-going commercial vessels were designated as "S/S" (steamship) or "M/V" (motor vessel).

2

arose at the discharge ports. Kolmar had sold the butadiene cargoes to purchasers in China and South Korea. The sales contracts contained specifications of purity of the substance. Evidence in the record on these motions tends to show that before the butadiene was loaded into the GAS MOXIE and the GAS EMPEROR at Haldia, India, certificates of quality, based on shore tank samples, showed that the butadiene was within the sales contract specifications. The problems encountered at the discharge ports, described *infra*, caused the vessels to exceed the amounts of time specified in the charter parties for completion of discharge of the cargo. Those delays gave rise to the Plaintiff shipowners' claims against Kolmar as charterer for demurrage. No. 1651 asserts a demurrage claim in respect of the GAS MOXIE. No. 1652 asserts a demurrage claim in respect of the GAS EMPEROR. Kolmar asserts a counterclaim against the shipowner in each action.

In No. 1651, Kolmar's counterclaim alleges that the GAS MOXIE sailed first to the port of Jiangyin, China, one of five major river ports on the Yangtze River. Sampling of the butadiene in the vessel's cargo tanks showed that it did not conform to the sales contract specifications. Specifically, the butadiene contained excessive amounts of "dimer," an element in the substance. The Chinese buyers of the butadiene rejected it. Kolmar and the buyers agreed that the GAS MOXIE would sail to Tianjin, a Chinese deep-water port and the maritime gateway to Beijing, where the cargo would be blended with sound butadiene, in an effort to bring the substance within the sales contract specifications. That effort failed. The buyers re-affirmed their earlier rejection of the butadiene. Eventually, Kolmar and the buyers negotiated an agreement whereby the buyers accepted the cargo in consideration of a substantial reduction in the contractual sales price.

In No. 1652, Kolmar's counterclaim alleges that the GAS EMPEROR sailed to the port of Daesan, South Korea, and discharged her butadiene cargo. Sampling in the vessel's cargo tanks

revealed a comparable excessive dimer content, greater than the amount allowed by the sales contract specifications. The Korean buyers at Daesan rejected the cargo. They agreed to accept it only after another vessel was brought to Daesan from the port of Yeosu, the GAS EMPEROR cargo was discharged into her, and blending was carried out, apparently successfully.

Defendant Kolmar's counterclaims in these cases seek to recover from the respective Plaintiff shipowners (Aracruz, owner of the GAS MOXIE and Empress, owner of the GAS EMPEROR) damages resulting from the alleged contamination of the butadiene cargoes during the ocean transportation. Those damages include reduction of the price Kolmar's Chinese buyers paid for the butadiene, and additional expenses incurred at the discharge ports in efforts to restore the cargo's condition through blending. Kolmar's theory of the case is that the butadiene cargoes were loaded into the vessels in good order and condition, and were contaminated during the ocean voyages as a result of the shipowners' breaches of warranties in the charter parties that the vessels would be seaworthy and in all respects fit for the carriage of the intended cargoes.

Both charter parties provided for arbitration in London, and the application of English law to the rights and obligations of the parties. Aracruz and Empress have retained counsel in the United Kingdom, so has Kolmar, and London arbitrators have been appointed. The merits of the claims of Aracruz and Empress for demurrage, and the claims of Kolmar for damages resulting from the cargoes' condition at the discharge ports, will be determined by the London arbitration.

This Ruling is concerned with litigation instituted in the United States.

## II. THE LITIGATION IN THE UNITED STATES

The captioned cases in this Court began on November 7, 2013, when American counsel for

4

Aracruz and Empress filed separate complaints with the Clerk. The filings occurred together, and the cases received successive docket numbers, Nos. 1651 and 1652. Each case was assigned randomly: No. 1651 to Judge Arterton, and No. 1652 to the undersigned.

By these complaints, on their faces at least, the Plaintiff shipowners seek to recover from Kolmar, as charterer, the amounts of demurrage the vessels accrued during delays at the discharge ports, as described in Part I. In No. 1651, Aracruz, as owner of the GAS MOXIE, claims demurrage and related costs in the total amount of $603,343.52. In No. 1652, Empress, as owner of the GAS EMPEROR, claims demurrage and related costs in the total amount of $188,254.57.

However, the Plaintiffs do not contemplate that this Court will ever render judgments in their favor and against Kolmar for demurrage, in these or any other amounts. All parties agree that the merits of Plaintiffs' claims will be determined by the arbitrators in London. If Plaintiffs succeed in their claims, the arbitrators will enter an award in their favor, in accordance with English practice. Plaintiffs commenced litigation against Kolmar in the United States for the sole purpose of obtaining security for their claims, in accordance with American practice.

Each complaint was accompanied by a prayer for a writ of attachment and garnishment pursuant to Rule B(1) of the Supplemental Rules for Admiralty or Maritime Claims (the "Admiralty Rules"). In each case, the Court entered an order authorizing the issuance of process for attachment. Rule B(1) entitled the Plaintiffs to that remedy because the charter parties were maritime contracts, Kolmar AG could not be found within this District, and funds belonging to Kolmar had been located within the District, in the hands of a Kolmar affiliate. The attachments succeeded. The file in No. 1651 shows that in that case, Kolmar has furnished a bank guarantee in the amount of $603,343.52, in which the issuing bank undertakes to pay an English arbitration award in final form in Plaintiff

...

Aracruz's favor, up to that amount. The file in No. 1652 does not contain comparable detail, but I assume for the sake of the discussion in Part III, *infra*, that in that case as well, Kolmar has furnished Plaintiff Empress with attached funds or their equivalent, in the amount of $188,254.57 demanded by the complaint.

In these two actions, Defendant Kolmar has responded with *pro forma* answers disputing Plaintiffs' demurrage claims. Kolmar knows, just like everyone else, that the merits of those claims will be decided in the London arbitration. Each answer is accompanied by a demand by Kolmar that the Plaintiff shipowner in question post security for the counterclaim Kolmar asserts for damages and expenses arising out of the shipowner's allegedly deficient performance of the charter party in question. In No . 1651, the case of Aracruz and the GAS MOXIE, Kolmar's counterclaim is for $4,819,952.52. In No. 1652, the case of Empress and the GAS EMPEROR, Kolmar's counterclaim is for $453,510.73. Kolmar bases its demands for counterclaim security on Rule E(7)(a) of the Admiralty Rules.

Plaintiffs resist these demands for countersecurity. Having availed themselves of the Admiralty Rules to obtain security from Kolmar for their claims, Plaintiffs prefer not to give Kolmar security under the Rules for its counterclaims. In aid of that preference, each Plaintiff moves to dismiss Kolmar's counterclaim against it, on a theory redolent of Rule 12(b)(6) of the Federal Rules of Civil Procedure. If those motions to dismiss Kolmar's counterclaims are granted, Plaintiffs reason, then no basis exists for Kolmar's demands that security be posted for them.

Kolmar responds with motions to compel security on its counterclaims. The Court is thus confronted with four motions: two by Plaintiffs to dismiss Defendant Kolmar's counterclaims, two by Kolmar to compel security for its counterclaims. *See* No. 1651 (consolidated docket), Doc. 35,

42 (motions to dismiss counterclaims); Doc. 26, 43 (motions for countersecurity). Given the similarity between the cases and the issues, these motions were consolidated for decision by a single Judge.

### III. DISCUSSION

Kolmar's motions to compel countersecurity depend upon Admiralty Rule E(7)(a), which provides in its entirety:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court for cause shown, directs otherwise. Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise.

In the cases at bar, Kolmar satisfies the threshold qualifications the Rule imposes for obtaining security for a counterclaim. Kolmar has given Aracruz and Empress security for the damages they claim in the original actions. Kolmar's counterclaims arise "from the transaction or occurrence that is the subject" of each original action; claims and counterclaims alike are triggered by the difficulties and delays encountered by the chartered vessels at the discharge ports.

While the Rule says that in those circumstances a plaintiff "*must* give security for damages demanded in the counterclaim" (emphasis added), the seeming mandate is immediately diluted by the following familiar phase: "unless the court for cause shown, directs otherwise." The Rule does not undertake to define what "cause shown" may consist of, but a district court has discretion to decide whether or not security should be given for a counterclaim, notwithstanding a defendant's satisfaction of the factual predicates for the order.

These principles are declared by the Second Circuit's decision in *Result Shipping Co., Ltd.*

*v. Ferruzzi Trading USA Inc.,* 56 F.3d 394 (2d Cir. 1995), which held that counterclaim security under Admiralty Rule E(7) was available to the defendant in a maritime charter party action governed by the Federal Arbitration Act, 9 U.S.C. § 8.  Judge Newman's opinion quoted the entire text of Rule E(7)(a), and then said:

> Although this Rule initially appears to make the posting of countersecurity mandatory whenever its conditions are satisfied, the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order countersecurity under such conditions.
>
> In exercising this discretion, the court should be guided primarily by two principles, which sometimes conflict with one another.  On the one hand, the purpose of Rule E(7) is to place the parties on an equality as regards security, which usually favors granting countersecurity when a defendant whose property has been attached asserts *non-frivolous* counterclaims growing out of the same transaction . . . . On the other hand, the Rule is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit.

56 F.3d at 399-400 (emphasis added) (citations and internal quotation marks omitted).

Judge Newman's formulation that only a *frivolous* counterclaim is not entitled to countersecurity has been uniformly followed by district courts in this Circuit, as the following cases illustrate, each ordering countersecurity to be furnished under Rule E(7).

In *Finecom Shipping Ltd. v. Multi Trade Enterprises AG,* No. 05 Civ. 6695 (GEL), 2005 WL 2838611, at * 1-2 (S.D.N.Y. Oct. 25, 2005), District Judge Lynch (as he then was) said: "The premise that countersecurity will not be required on the basis of frivolous counterclaims is a sound one," and added: "On the current record it cannot be said that defendant's counterclaim is frivolous . . . . [T]here  appear to be factual disputes, to be resolved by the arbitrators, about the true nature of the parties' agreement, and it cannot be said that the counterclaim is frivolous."

In *Voyager Shipholding Corp. v. Hanjin Shipping Co.*, 539 F.Supp.2d 688, 691-692 (S.D.N.Y. 2008), Judge Lynch said that "countersecurity will not be awarded for counterclaims that are blatantly without merit"; he added, however, that "the inquiry into the merits of the claims is severely limited . . . . [T]he fact that a well-pleaded counterclaim is not supported with evidence is not an obstacle to a requirement of countersecurity. . . . That an expert, through legal analysis, concludes that a claimant is unlikely to succeed in litigation does not indicate that the claim is frivolous, in any event. Hanjin unsurprisingly has submitted a contrary opinion by its solicitor. . . . Hanjin's claims are well-pleaded and based on plausible if debatable legal theories. That is sufficient to hurdle *the frivolity bar* and support a claim for countersecurity." (emphasis added) (citations and internal quotation marks omitted).

In *Ocean Line Holdings Ltd. v. China National Chartering Corp.*, 578 F.Supp.2d 621, 627 (S.D.N.Y. 2008), District Judge Chin (as he then was) said: "The trial court may consider the merits of the counterclaim, but it should do no more than screen out totally frivolous claims by the counterclaimant." (citations and internal quotation marks omitted).

In *Front Carriers Ltd. v. Transfield ER Cape Ltd.*, No. 07 Civ. 6333 (RJS), 2007 WL 4115992 (S.D.N.Y. Nov. 19, 2007), District Judge Sullivan dealt with Admiralty Rules B and E(7) in the context of claims arising out of alleged breaches of a contract of affreightment which provided for arbitration in Paris and the applicability of French law. One party obtained security for its claim under Rule B, and then argued that the other party was not entitled to countersecurity on its counterclaim under Rule E(7) because "its counterclaim cannot, as a matter of law, support an award of damages under French law," and consequently was "speculative" and "not entitled to countersecurity." 2007 WL 4115992, at *2. Judge Sullivan rejected this rationale for denying

9

countersecurity:

> The Court rejects FCL's argument because it calls for this Court to conduct an intensive inquiry into the merits of Transfield's counterclaim – an inquiry that is contrary to the relevant authority in this Circuit, and in other circuits, applying Rule E(7). The Rule E(7) standard set forth by the Second Circuit in *Result Shipping* provides for a severely limited inquiry into the merits of the counterclaim at issue. Specifically, with regard to the merits of a movant's counterclaim, the court in *Result Shipping* simply stated that Rule E(7) "favors granting countersecurity when a defendant ... asserts *non-frivolous* counterclaims . . . ." *Result Shipping*, 56 F.3d at 399.
>
> Similarly, the overwhelming weight of authority among courts in this Circuit, and in other circuits, favors the view that, with regard to the merits of the movant's counterclaim, the court should do no more than screen out "totally frivolous claims" by the counterclaimant upon review of a motion under Rule E(7). . . .
>
> In addition, it is clear that Transfield's counterclaim is "non-frivolous." Specifically, based on the pleadings submitted in this action, Transfield presents a colorable claim for damages arising from FCL's alleged breach of the COA and the consequent lost opportunity for Transfield to complete "positioning voyages" under the COA.

*Id.* at *2-3 (citations omitted).

No further citation of authority is necessary. An unbroken line of cases, appellate and district court, hold that Admiralty Rule E(7) entitles an admiralty or maritime counterclaimant to reciprocal countersecurity unless its claim can fairly be characterized as manifestly and blatantly frivolous. That cannot be said of Kolmar's counterclaims in the cases at bar. The claims and counterclaims in these cases epitomize an ages-old confrontation between vessel interests and cargo interests. A ship transports cargo across an ocean. The cargo is discovered to be in damaged or unsatisfactory condition at the discharge port. Those interested in the cargo allege that it was delivered to the ship in good order and condition at the loading port, and arrived at the discharge port in damaged or

contaminated condition, owing to the ship's unseaworthy condition or the failure of officers and crew to properly care for the cargo. The shipowner alleges that its ship was beyond reproach, and any difficulties must be ascribed to the pre-loading condition or inherent vice of the cargo. One would not be surprised to learn that this fundamental dispute is as old as the Laws of Oleron, and may even be traceable to the earlier maritime codes of the Rhodians and Phoenicians. In more modern times, the dispute usually takes place within the context of the Carriage of Goods by Sea Act ("COGSA") and an ocean bill of lading, or (as in these cases) a private maritime contract called a charter party. In its counterclaims, Kolmar asserts familiar maritime claims for breach of charter party and cargo damage.

The merits of the claims and counterclaims asserted in these cases will be determined by the arbitrators in London. For the purposes of Admiralty Rule E(7), I conclude without difficulty that Kolmar's counterclaims are non-frivolous. Kolmar asserts familiar maritime claims for cargo damage allegedly resulting from shipowners' breaches of charter party warranties and the vessels' several faults. The factual allegations supporting the counterclaims are straightforward, lucid, complete, and well-pleaded. While the cases construing Admiralty Rule E(7) hold that a defendant moving for countersecurity need not at that stage accompany its motion with evidence establishing the counterclaim's merits, in the case at bar Kolmar has submitted proof in the form of cargo surveys at the loading port and discharge ports which are consistent with its claims.

Aracruz and Empress contend, in their motions to dismiss Kolmar's counterclaims, that Kolmar is not entitled to maintain them because "the sale contract shows title and risk passed to the buyer upon loading." Reply Brief in No. 1652 [Doc. 33], at 3. The question is essentially one of standing. Kolmar submits a declaration by its English solicitor, Michael Dale, who points out that

"[t]he cargo was rejected by the prospective buyers and receivers of the goods shipped under the bill of lading . . . due to contamination," and the buyers "refused to accept and/or pay for the goods." Doc. 35, ¶ 8. Mr. Dale further states that under the controlling English law, the effect of this rejection was the retention by the seller (Kolmar) of property rights in the goods and the concomitant right to sue the shipowners for damages resulting from the contamination. *Id.*, ¶ 9. Dale opines that Kolmar's counterclaim in the Empress case, as submitted to this Court, presents "a well-founded claim for loss and damage to cargo caused by a breach of Empress Enterprise Ltd's duties under the subject charter[]party," and "sufficiently pleads a proper, non-frivolous claim under English law and arbitral procedure." *Id.*, ¶¶ 15, 16. This analysis is equally applicable to the Aracruz case.

While the opinions of an English solicitor retained by Kolmar are not binding upon this Court or upon the Plaintiffs, Mr. Dale's declaration is sufficient to show (1) that Kolmar's right to assert these claims, under the terms of the relevant contracts and as a result of the events that occurred, is one of the questions that will be decided under English law by the arbitrators in London, and (2) it is at least arguable that, under English law, Kolmar has the right to assert these claims against the shipowners. That is sufficient, under American law governing admiralty practice in this Court, to defeat the Plaintiffs' contention that Kolmar's counterclaims are frivolous because the sales contracts deprive Kolmar of the right to assert them.[3]

---

[3] Plaintiffs cast their motions to dismiss Kolmar's counterclaims in terms of Fed. R. Civ. P. 12(b)(6). At the hearing, a question arose during colloquies between counsel and the Court as to whether a claim could be *implausible* under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and therefore subject to dismissal under Civil Rule 12(b)(6), but *non-frivolous* under Admiralty Rule E(7)(a), and therefore entitled to countersecurity. The question is intellectually stimulating, but I need not answer it in this case. Assuming without deciding that Civil Rule 12(b)(6) standards control entitlements to countersecurity under Admiralty Rule E(7)(a), there is nothing implausible about Kolmar's counterclaims. Accepting their well-pleaded factual allegation as true, as I must on a motion to dismiss, for the reasons stated in text, these counterclaims state a classic maritime claim

Kolmar bases its motions for countersecurity on the amounts it calculates the arbitrators will award them against the shipowners if all claims and counterclaims are decided in Kolmar's favor. This is an appropriate way to proceed, and the amounts stated are facially reasonable. In No. 1651, involving the voyage of the GAS MOXIE, Kolmar demands that Plaintiff Aracruz post countersecurity in the total amount of $4,819,952.52. In No. 1652, involving the voyage of the GAS EMPEROR, Kolmar demands that Plaintiff Empress post countersecurity in the total amount of $453,510.73. Each claim is itemized. *See* counterclaim in No. 1651 [Doc. 24] at ¶ 22; counterclaim in No. 1652 [Doc. 22] at ¶ 20. The GAS MOXIE counterclaim is larger than the GAS EMPEROR counterclaim because the Chinese buyers of the first ship's cargo were seemingly more intransigent than the South Korean buyers of the second ship's cargo, or the blending of the contaminated cargo was performed more effectively at the Korean discharge port than at the Chinese discharge port, or some other factors. Kolmar must, of course, prove all these items of damage to the arbitrators, but for the purpose of securing a counterclaim under Admiralty Rule E(7), Plaintiffs Aracruz and Empress, in the words of the Rule, "must give security for damages demanded in the counterclaim." It is of no moment that Kolmar demands counterclaim security in a total amount greater than Plaintiffs obtained by their earlier Rule B writs of attachment. As Judge Lynch said of Rule E(7)(a) in *Pancoast Trading S.A. v.. Eurograni S.r.l.,* No. 07 Civ. 8581 (GEL), 2008 WL 190376, at *1 (S.D.N.Y. Jan. 22, 2008): "The rule provides that the plaintiff must give security 'for damages demanded in the counterclaim,' and does not limit the countersecurity to the amount of the security provided by the defendant to secure the plaintiff[']s claim."

For the foregoing reasons, the Court will grant Defendant Kolmar's motions directing

---

for damage to cargoes transported by ships across one of the world's oceans.

Plaintiffs Aracruz and Empress to post security for Kolmar's counterclaims, in the amounts stated.

A final issue arises out of Kolmar's request that the arbitration proceeding in London be stayed until Aracruz and Empress have posted that security. The last sentence of Rule E(7)(a) provides: "Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise." At least three district courts in this Circuit have considered requests that they stay arbitration proceedings in London until a plaintiff obtaining security in a United States district court posts countersecurity. In *Daeshin Shipping Co., Ltd. v. Meridian Bulk Carriers, Ltd.*, No 05 Civ. 7173 (NRB), 2005 WL 2446236, at *3 (S.D.N.Y. Oct. 3, 2005), Judge Buchwald acknowledged that she had not "found significant case law to assist us in resolving this issue" of the extraterritorial effect of an American admiralty court's stay order, but derived her authority from the last sentence of Rule E(7)(a) and granted the stay, reasoning that "staying Daeshin's arbitral claims will provide an incentive to post counter-security promptly so that the London arbitration that is in its earliest stages can proceed."

In *Voyager Shipbuilding Corp.*, Judge Lynch was confronted with the argument that "if Voyager fails to post countersecurity as required, the Court should enjoin Voyager from proceeding with its claims in the London arbitration." 539 F.Supp.2d at 693. Judge Lynch expressed "a natural reluctance to interfere in a foreign proceeding by enjoining an arbitration that the parties have mutually agreed is the appropriate forum to resolve their disputes, in aid of a proceeding that is largely collateral to the proceedings in that forum." *Id.* at 693-94. I share Judge Lynch's reluctance, and could not express it better, or as well. Judge Lynch declined to stay the London arbitration. As an alternative, he said meaningfully:

> The Court has inherent power to enforce its orders against parties

14

> who have thus sought its aid. Should Voyager fail to comply with the countersecurity requirement of Rule E, which is a condition of the availability of the attachment provided by Rule B, the Court retains the power to vacate its order of attachment, and will not hesitate to utilize that power if necessary.

*Id*. at 694 (footnote omitted).

In *Verton Navigation, Inc. v. Caribica Shipping Ltd.*, No. 90 Civ. 6940 (JFK), 1991 WL 90807, at *2 (S.D.N.Y. May 21, 1991), Judge Keenan directed the posting of countersecurity under Rule E(7), and then said succinctly: "The Court declines to stay the action pending the posting of security in order to avoid interfering with the ongoing arbitration in London."

As for the cases at bar: Assuming without deciding, but as the cited cases would seem to indicate, Admiralty Rule E(7)(a) gives this Court the power to enjoin the London arbitration, or at the least stay the Plaintiffs' participation in it, which would have the practical effect of enjoining the arbitration in London of all claims between Aracruz, Empress, and Kolmar. The exercise of that power is committed to the Court's discretion. In these cases, I decline to exercise it. I share Judge Lynch's perceptions and am guided by his resolution of the matter, as expressed in *Voyager Shipholding.* These cases present complex questions involving very considerable sums. English lawyers have been retained and English arbitrators are preparing to decide questions which turn upon the application of English law. This is the forum and the procedure upon which the parties agreed in their contracts of charter party. In these circumstances, this Court will not interfere with the London arbitration.

It does not follow that the Court's orders for the posting of countersecurity are empty gestures. The Court expects Plaintiffs to obey its Orders. However, should Aracruz and Empress fail to post the countersecurity directed in this Ruling under Rule E(7)(a), this Court will follow

Judge Lynch's example and, upon application by Kolmar, the Court will vacate the attachments Aracruz and Empress obtained previously under Rule B. Judge Newman tells us in *Result Shipping* that a principal purpose of Rule E(7) is "to place the parties on an equality as regards security." 56 F.3d at 399 (citation omitted). If Aracruz and Empress fail to post countersecurity, and the Court vacates the security Kolmar was forced to give through attachment, then "an equality as regards security" will have been achieved: no one will have any. The "largely collateral" proceedings in this American Court would come to an end, and the London arbitration would go forward, resulting in such an unsecured award as the arbitrators decide the justice of the cause requires.

### IV.  CONCLUSION

For the foregoing reasons, the Court resolves the pending motions as follows:

**With respect to the case bearing Docket Number 3:13-cv-1651:**

1.  The motion of Plaintiff Aracruz Trading Ltd. [Doc. 35] to dismiss the amended counterclaim of Defendant Kolmar Group AG is DENIED.

2.  The motion of Defendant Kolmar Group AG [Doc. 26] for an order requiring Plaintiff Aracruz Trading Ltd. to post countersecurity in an approved form for the amount of $4,819,952.52 is GRANTED.

**With respect to the case bearing Docket Number 3:13-cv-1652:**

1.  The motion of Plaintiff Empress Enterprises, Ltd. [No. 1651, Doc. 42] to dismiss the counterclaim of Defendant Kolmar Group AG is DENIED.

2.  The amended motion of Defendant Kolmar Group AG [No. 1651, Doc. 43] for an order requiring Plaintiff Empress Enterprises, Ltd. to post countersecurity in an approved form for the

amount of $453,510.73 is GRANTED.[4]

It is SO ORDERED.

Dated:   New Haven, Connecticut
         January 21, 2015

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

[4]   The Court notes that Empress's motion to dismiss Kolmar's counterclaim and Kolmar's motion for countersecurity against Empress are also docketed in case No. 1652 at Doc. 23 and 27, respectively.  Because No. 1651 is the lead consolidated action for purposes of these motions, the Court's Rulings on the motions will be filed on that docket.